UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ADRIENNE WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.   4:14CV353 TIA |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.  The

suit involves Applications for Disability Insurance Benefits under Title II of the Social Security

Act and for Supplemental Security Income under Title XVI of the Act.  Claimant has filed a Brief

in Support of her Complaint, and the Commissioner has filed a Brief in Support of her Answer.

The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

**I.      Procedural History**

On April 10, 2008, Claimant Adrienne Wilson filed Applications for Disability Insurance

Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 313-16) and for Supplemental

Security Income payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381,

et. seq.  (Tr. 310-12).[1]  Claimant states that her disability began on January 1, 2006,[2] as a result of

---

[1]"Tr." refers to the page of the administrative record filed by the Defendant with her Answer
(Docket No. 13/filed May 2, 2014).

[2]Although Claimant originally alleged an onset date of August 1, 2008 in her applications, she
amended her onset date to July 24, 2009.  (Tr. 15).

fibromyalgia, knee and hand problems, multiple screws in her right ankle, migraine headaches, depression, stress, loss of hand function, and limited ability to sit, stand, walk, and lift her arms overhead. (Tr. ). On initial consideration, the Social Security Administration denied Claimant's claims for benefits. (Tr. 146-51). Claimant requested a hearing before an Administrative Law Judge ("ALJ"). On December 8, 2009, a hearing was held before the ALJ who issued an unfavorable decision on June 8, 2010. (Tr. 34-65, 105-16).[3] Claimant filed a request for review with the Appeals Council on September 29, 2011. (Tr. 404-05). The Appeals Council vacated the hearing decision and remanded this matter back to the ALJ in a decision dated February 13, 2012. (Tr. 122-27). On May 23, 2012, a supplemental hearing was held before the ALJ who issued an unfavorable decision on October 12, 2012. (Tr. 17-27, 66-101).[4] After considering the mental residual functional capacity completed by Dr. Loon-Tzian Lo on June 15, 2013, the Appeals Council found no basis for changing the ALJ's decision on January17, 2014. (Tr. 1-4).[5]

## II.     Evidence Before the ALJ

### A.  Hearing on December 8, 2009

#### 1.  Claimant's Testimony

---

[3]Claimant testified and was represented by counsel. (Id.). Vocational Expert Delores Gonzalez and Medical Expert Philip Toops also testified at the hearing. (Tr. 59-64, 197-200).

[4]Claimant testified and was represented by counsel. (Id.). Vocational Expert Jeffrey Magrowski and Medical Experts Anne Winkler and James Reid also testified at the hearing. (Tr. 74-100, 214-32).

[5]In finding the additional medical records did not provide a basis for changing the ALJ's decision, it noted how the records reflect medical treatment Claimant received after the ALJ issued his decision, and therefore the records do not affect the ALJ's decision about whether she was disabled beginning on or before October 12, 2012. See e.g., Roberson v. Astrue, 481 F.3d 1020, 1026 (8th Cir. 2007) (finding no error in Appeals Council's decision that new records prepared seven months after ALJ's decision described claimant's condition on date records were prepared, not on earlier date, and consequently were not material).

At the hearing on December 8, 2009, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 34-65). At the time of the hearing, Claimant was forty-three years of age, and her date of birth is February 19, 1966. (Tr. 39). Claimant lives in a house with her mother and sometimes her daughter's apartment. (Tr. 39). She is right-handed and graduated from high school. (Tr. 41). Claimant stands at five feet six inches and weighs two hundred forty-two pounds. (Tr. 41). She receives $59 a month from the housing authority and food stamps. (Tr. 42). Claimant smokes ten to fifteen cigarettes each day. (Tr. 50). Claimant testified that Dr. Ali, her rheumatologist, told her to use a cane. (Tr. 50). On occasion she uses marijuana. (Tr. 51). Although she has a valid driver's license, she does not drive. (Tr. 52).

Claimant testified that she last worked at Bon Appetite as a cashier in 2005. (Tr. 42). She left the job because of her left knee surgery. (Tr. 43). She had worked in the job for almost three years. Earlier, she worked at Maximum Healthcare Services as a certified nurse assistant and then at K-Force Incorporated Subsidiaries. (Tr. 43). She also worked at Unity Healthcare and B.C. Home Care Services as a certified nurse assistant. (Tr. 44). Earlier, Claimant worked at National and then at Schnucks as a cashier and sometimes food prep. (Tr. 44).

Claimant testified that she can no longer work because of her fibromyalgia and two bad knees. (Tr. 47). A rheumatologist started treating her fibromyalgia two years earlier, and she takes Lyrica and Gabapentin. She was diagnosed with a sporadic colon in 2006. (Tr. 47). Claimant has had surgery on both of her knees. (Tr. 48). After surgery, she could not work for a while. (Tr. 48). Claimant started taking Celexa as treatment for depression one year earlier, and she has seen a psychiatrist and a therapist for one year, once a month. (Tr. 49). She testified that her medications make her drowsy and sometimes triggers headaches. (Tr. 50). Claimant started

using a cane after the first knee surgery.  (Tr. 50).  She had rotator cuff surgery in 2004.  (Tr. 54).  Claimant has crying spells every day or every other day.  (Tr. 56).  She is fatigued and lacks energy.  (Tr. 57).

Claimant testified that she can dress in the morning with some assistance.  (Tr. 52).  She does not wash dishes, do the laundry, or vacuum.  (Tr. 53).  Sometimes she goes to the grocery store with her mother or daughter but not for a long period of time.  (Tr. 53).

Claimant does her own laundry and cooking.  (Tr. 49).  Her mother helps her with the grocery shopping.  (Tr. 50).  She cannot stand for a long period of time.  (Tr. 50).  Two weeks earlier, she started to wear a brace provided by pain management.  (Tr. 51).  Two months earlier, she received a shot as treatment.  (Tr. 52).  Her mother visits twice a week and helps care for her daughter.  (Tr. 55).

Claimant can stand against a wall for five to ten minutes.  (Tr. 54).  On a good day, she can walk without assistance from the house to the car.  Sitting is difficult, she has to shift often and prop up her leg.  (Tr. 54).  She has problems lifting smaller objects.  (Tr. 55).

**B.  Hearing on May 23, 2012**

**1.  Claimant's Testimony**

At the hearing on May 23, 2012, Claimant testified in response to questions posed by the ALJ and counsel.  (Tr. 66-101).  She testified that her conditions have worsened, and she now walks with two canes since January.  (Tr. 70).  She has not used marijuana for over a year.  (Tr. 73).

**2.  Testimony of Vocational Expert**

Vocational Expert Dr. Jeffrey Magrowski testified at the hearing. (Tr.91-100). Dr. Magrowski identified Claimant's vocational history as a cashier for food service, a light, unskilled job; a certified nurses aide, a heavy, semiskilled job; and a cocktail waitress, a medium, semiskilled job. (Tr. 93). He listed her transferrable skills as including communication, scheduling, use of some medical equipment, and some basic clerical skills. (Tr. 94).

The ALJ asked Dr. Magrowski to assume that

a hypothetical individual with the claimant's education, training, work experience at the time of AOD, further assume the individual can, for my first hypothetical, this individual can perform light work. They can lift 20 pounds occasionally, 10 pounds frequently, stand and walk six hours out of eight, no limits on sitting, following other limitations, climb stairs and ramps occasionally, never climb ropes, ladders, scaffolds, balance frequently, stoop, kneel, crouch, crawl, occasionally. This individual must avoid concentrated exposure to extreme cold, wetness, heat and the sun, humidity and hazards of heights. This individual can understand, remember, carry-out at least simple instructions, non-detail task, demonstrate adequate judgment to make simple work related decisions, adapt to routine, simple work changes, perform repetitive work according to set procedures sequence and pace. Based on my first hypothetical, could the individual perform any past work?

(Tr.94). Dr. Magrowski indicated she could perform some cashiering work, a light and unskilled job with at least 6.000 jobs in Missouri and over 300,000 jobs available nationally; and some work as an usher, light and unskilled with 1,000 jobs available in Missouri and over 50,000 available in the national economy. (Tr. 95).

The ALJ next asked Dr. Magrowski the following:

... second hypothetical same as the hypothetical one except I did make a change in the mental limitations. This individual can maintain concentration and attentions for two hour segments over an eight hour period, demonstrate adequate judgment to make simple work related decisions, adapt to routine simple work changes, can perform work at a normal pace without production quotas. Would that individual be able to perform the jobs you gave me for hypothetical one?

(Tr. 95). Dr. Magrowski responded yes. (Tr. 95).

For the third hypothetical, he ALJ asked Dr. Magrowski the following:

My third hypothetical I drop to sedentary and that's just a straight sedentary. All other limitations remain the same as hypothetical two so it's, I just changed from the light to the sedentary, straight sedentary. Would that impact the jobs, it would because they're both light. Are there any jobs? If so, give me two if yo have them.

(Tr. 95-96). Dr. Magrowski opined there would be some work as a surveillance system monitor with 300 jobs in Missouri and 10,000 jobs available in the national economy; and a stuffer of toys or small items with about 400 jobs in Missouri and 10,000 jobs available in the national economy. (Tr. 96). In his fourth hypothetical, the ALJ added the individual would need two additional breaks beyond the normal two breaks and lunch break. Dr. Magrowski opined this individual would require special accommodations. (Tr. 96).

Counsel asked Dr. Magrowski to assume the limitations of Dr. Saleh as follows:

Assume we have a person who is only able to sit for two hours at a time, could walk a half a block, could stand and/or walk less than two hours in an eight hour work day, sit about two hours in an eight hour work day, would need periods of walking around during an eight hour working day every 45 minutes for about five minutes at a time, would need a position that allowed shifting positions at will from sitting, standing or walking, would need to take unscheduled breaks during an eight hour day, that would be unpredictable. Could rarely lift, lift less than 10 pounds and never 10 pounds or more, could rarely twist, stoop, crouch, squat and would miss about four days of work per month. With those limitations would the individual be capable of past work or any other work?

(Tr. 96-97). Dr. Magrowski indicated he did not know of any work. (Tr. 97).

Counsel asked Dr. Magrowski to assume Dr. Morris' report:

... this person could occasionally lift up to 10 pounds, never 11 pounds or more and could never carry up to 10 pounds. The individual could only sit for 15 minutes at a time, stand for 10 minutes at a time and walk for 10 minutes at a time for a total of only two hours in an eight hour work day of sitting, 30 minutes of standing and 15 minutes of walking and would need a cane to ambulate, must never reach overhead with either the left or right hand and never to reach in all other directions with the left or right hand, never push or pull, never to use foot

controls on the right but occasionally use foot controls on the left, who is never to climb stairs, ramps, ladders, scaffolds, balance, stoop, kneel, crouch or crawl, never work at unprotected heights, moving mechanical parts or operating a motor vehicle. With those limitations would anybody be capable of past work or other work?

(Tr. 97). Dr. Magrowski responded no and noted elevation of legs is not allowed in competitive employment. (Tr. 97). Dr. Magrowski explained that an individual would have to remain on task and meet the expectations of the employer at least 95% of the time to be viewed as successful. (Tr. 98).

### 3. Testimony of Medical Experts Dr. Anne Winkler and Dr. James Reid

Dr. Anne Winkler is board certified in internal medicine and rheumatology. (Tr. 74). Dr. Winkler testified that a review of the medical record shows Claimant has irritable bowel syndrome, probable fibromyalgia, chondromalacia patella, mild osteoarthritis in her knees, obesity, sjogren's syndrome, diabetes controlled by diet, and rheumatoid arthritis. (Tr. 76-77). Based on her review of the record, Claimant could not equal any listing. (Tr. 78). Dr. Winkler opined she was not comfortable making the diagnosis of actual fibromyalgia without additional physical examination findings such as any positive control point. (Tr. 79). Dr. Winkler noted how the medical records do not reflect a doctor prescribing the use of one or two canes, and she would not prescribe any canes. (Tr. 79-80).

Based on the documented data, Dr. Winkler found Claimant able to lift or carry twenty pounds occasionally, ten pounds frequently; she could stand or walk six hours in an eight-hour workday; and she has not limits with respect to sitting. (Tr. 80). Her postural limitations would include occasional stairs; never use ladders, ropes, or scaffolds; frequent balance, bend and occasional stooping, kneeling, crouching, and crawling. Dr. Winkler found she does not have any

manipulative, visual, or communicative limitations. With respect to environmental limitations, Dr. Winkler found she should avoid unprotected heights, concentrated exposure to sun or cold, wet and some humidity. (Tr. 80).

Dr. James Reid, a clinical psychologist, found Claimant to have borderline intellectual functioning and depression and to be noncompliant off and on. (Tr. 87). Dr. Reid also included cannabis abuse in May 2009. (Tr.88). Dr. Reid opined Claimant would not meet or equal any listing, and he agreed with the state agency on the psychiatric review technique finding mild limitations on daily activities, mild on social functioning, and moderate on concentration, persistence, and pace and none on episodes of decompensation. (Tr. 88).

## III.     Medical Records and Other Records

To obtain disability insurance benefits, Claimant must establish that she was disabled within the meaning of the Social Security Act not later than the date her insured status expired - March 31, 2010. Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) ("In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status."); see also 42 U.S.C. §§ 416(I) and 423(c); 20 C.F.R. § 404.131.

Dr. Steven Johnson performed a hysterectomy on June 4, 2002 to relieve her pelvic pressure. (Tr. 482). Dr. Johnson found Claimant to be quite well oriented in time and space. (Tr. 482).

The January 26, 2006 Body Bone Scan showed mildly increased uptake of radiopharmaceutical at T7 to T8 probably degenerative in nature, increased uptake at left knee may be postoperative or secondary to osteoarthritic change, increased at right knee secondary to arthritis, and increased uptake at sternum and AC joints. (Tr. 460, 604).

On May 11, 2006, Dr. Reyna Caldwell completed an initial evaluation and then follow-up treatment at St. Louis University Rheumatology Clinic. (Tr. 553). She reported one month earlier she noticed bilateral hand pain and swelling but prior to then, she had no problems with her hands. She underwent arthrocentesis, and she did not have any evidence of rheumatoid arthritis. At the initial visit, she presented stating that she was her for a second opinion of this diagnosis. (Tr. 553). Musculoskeletal examination showed diffuse tenderness of all the small joints of her left hand, bilateral wrists, left elbow, and bilateral second, third, and fourth MTPs, but she had no active synovitis in any of these joints. (Tr. 554). Her grip strength was assessed to be 100% bilaterally. Dr. Caldwell listed positive rheumatoid factor, arthalgias, myalgias, and fatigue, and elevated sedimentation rate as her impression. When she returned, Claimant had not had the x-rays requested, but she did have the laboratory evaluation. (Tr. 555). Dr. Sona Kamat found she most likely has a Sjogren's/lupus like overlap syndrome, prescribed Plaquenil, and requested she follow up in three months for further evaluation. (Tr. 555).

On May 25, 2006, Dr. David Kiefer performed an arthroscopy, chondral abrasion, abrasion of arthroplasty of medial femoral condyle, and resection of medial synovial plica. (Tr. 492-93). Her past medical history included arthritis, borderline diabetes, endometriosis, gastroesophageal reflux disease, and irritable bowel syndrome. (Tr. 494). She had right knee trace effusion, a positive McMurray sign, and medial joint line tenderness. (Tr. 494). Right medial meniscus tear was the pre-procedure diagnosis. (Tr. 495).

Claimant presented in the emergency room on February 7, 2007 for evaluation of abdominal pain, and she reported having a history of sjogren's syndrome, endometriosis, hysterectomy, orthopedic left and right knee surgeries, and genitourinary disease, and no previous

psychiatric history. (Tr. 582). The psychiatric examination showed her to be oriented 3 and to have a normal affect. (Tr. 583). She was observed as having a steady gait. (Tr. 587).

On April 13, 2007, Claimant established care with Dr. John Lautenschlager and complained of muscle spasm, joint pain, and abdominal pain. (Tr. 640). Dr. Lautenschlager found her mental status to be alert, and her gait to be limping. (Tr. 641). His mental status examination made findings of oriented x3, and appropriate mood and affect. (Tr. 642). Dr. Lautenschlager found her bilateral musculoskeletal movements to be painful. (Tr. 643). In follow-up on May 8, she returned for blood draw and complained of intermittent swelling in her feet and hands. (Tr. 638).

On May 11, 2007 on referral from South County, Claimant complained of pain all over her body and being diagnosed with sjogrens syndrome and mentioned lupus. (Tr. 531). She is not taking any depression medications. (Tr. 532). The musculoskeletal examination showed no muscle tenderness. (Tr. 533). Dr. Ali observed her gait and stance to be normal. (Tr. 533). Dr. Ali found Claimant to have arthralgias in multiple sites. (Tr. 534).

On June 5, 2007, Claimant presented with complaints of fatigue and in response to a nurse's call. (Tr. 632). On June 8, Dr. Lautenschlager ordered further blood testing. (Tr. 631). In follow-up treatment on June 26, she reported falling yesterday and hurting her back and hip and requested pain medications for the pain. (Tr. 628). She also experiences fatigue during exertion, and this interferes with her daily activities, and the symptoms have not been associated with depression or history of psychiatric illness. Musculoskeletal examination showed back pain and joint swelling appeared to be reduces since taking prednisone. (Tr. 628). Dr. Lautenschlager prescribed oxycodone as treatment for the bruised ribs and back from her fall. (Tr. 629).

During treatment on June 22, 2007, Claimant reported lower back pain and left knee pain but she has no other verbal complaints. (Tr. 525). Dr. Ali noted how she started taking diclofenac twice daily with some relief and improvement of joint swelling in her left hand since last visit. (Tr. 526, 685). Dr. Ali noted she has good exercise habits including ortho exercises for her knees such as tread mill and stair master and exercising regularly. (Tr. 526, 685). Examination of her back showed no costovertebral angle tenderness, her cervical, thoracic, and lumbar spines exhibited no muscle spasms, and no muscle tenderness observed. (Tr. 528). Dr. Ali observed her mood not to be anxious and her gait to be abnormal with limping noted on the right side. His assessment included multiple joint disorder and discussed the etiology of her complaints and prescribed a trial of prednisone once a day. (Tr. 528).

On July 20, 2007, Claimant reported pain in her lower back and improvement in her left knee. (Tr. 519). Dr. Ali treated her one month earlier for polyarthralgias and positive RF and gave her a trial of prednisone, and she reported marked improvement in joint swelling but she stopped taking prednisone two weeks earlier. (Tr. 520). After she stopped taking prednisone, she did well for two weeks but then she noticed pain in her fingers. (Tr. 520). She reported being disabled for the last two years. (Tr. 521). She is not fatigued. (Tr. 521). Examination of her cervical spine and thoracic spine showed no muscle spasms and lumbar spine exhibited muscle spasms. (Tr. 522). Dr. Ali observed her gait to be abnormal, an antalgic gait and found she has normal hand grip bilaterally and a normal range of motion of hands bilaterally. (Tr. 522).

In the October 11, 2007 St. Louis Connect Care progress note, Claimant reported pain all over her body. (Tr. 515, 681). Dr. Ali noted how she was last seen for possible rheumatoid arthritis. (Tr. 516, 682). Claimant reported that she stopped taking prednisone one month earlier

and recently started taking lyrica for her fibromyalgia and after taking the medication for one week she was doing well, but she ran out of the medication and currently has diffuse body pain. (Tr. 516, 682). Musculoskeletal examination showed no muscle tenderness. (Tr. 518). Dr. Ali found she had multiple tender points and may have some fibromyalgia component but no evidence of synovitis. He encouraged her to exercise regularly. Dr. Ali observed her gait to be normal, her hand grip to be normal bilaterally, and normal passive range of motion of her joints. (Tr. 518).

On November 15, 2007, she reported bilateral knee pain for two months. (Tr. 623). Musculoskeletal examination revealed a decreased range of motion and movements to be painful and crossed straight leg raising to be negative. (Tr. 624). Dr. Lautenschlager found she had no pain in bilateral movement of her knees and a full range of motion and mild crepitus and patellar crepitus. (Tr. 624). Dr. Lautenschlager noted her joint pain being treated by Saint Louis Connect Care Rheumatology, prescribed oxycodone for pain, ordered x-rays of her knees, and referred her to St. Louis Connect Care for orthopedics. (Tr. 625).

The November 27, 2007 x-rays of her knees showed mild osteoarthritis. (Tr. 679).

In the January 7, 2008 St. Louis Connect Care progress note, she reported pain in left knee and check up on right knee. (Tr. 512, 675). The doctor suggested a cortisone shots as plan of treatment. (Tr. 512, 675).

In follow-up treatment at St. Louis Connect Care on January 28, 2008, Claimant received a cortisone shot injected into her right knee, and she complained of pain in both knees. (Tr. 510, 674). Physical examination showed a good range of motion and positive crepitus. (Tr. 510, 674).

On April 3, 2008, Claimant complained of lower abdominal pain and ongoing pain problem. (Tr. 620, 803). Dr. Lautenschlager noted he should consider her fatigue to be caused

by clinical depression. (Tr. 621). In follow-up treatment on April 17, she denied any problems. (Tr. 616). Claimant reported her fatigue is strongly related to situational stress. (Tr. 616). Dr. Lautenschlager observed her to be mildly depressed, and the mental examination performed with findings of oriented x3 with appropriate mood and affect. (Tr. 617). Dr. Lautenschlager referred Claimant to Social Services for evaluation of situational stress problem, and he did not start any medications. (Tr. 617). On April 28, she had a cortisone injection in her left knee. (Tr. 615, 672). She was scheduled to have another cortisone shot in three to four months. (Tr. 672).

On April 17, 2008, Claimant presented at North Central Community Center with complaints of fatigue only during exertion and this interferes with activities of daily living. (Tr. 800). In the Mental Status examination, she is noted to be alert and mildly depressed and she is oriented x3 with appropriate mood and affect. (Tr. 800). Dr. Lautenschlager referred her to St. Louis Connect Care Rheumatology and prescribed Oxycodone. (Tr. 801).

On April 28, 2008, Claimant received a cortisone injection in her knee. (Tr. 799).

In the May 6, 2008 Rheumatology Progress Note at St. Louis Connect Care, Claimant reported having pain all over her body and Neurontin helping with the pain, but she had been out of Neurontin for two weeks. (Tr. 500). Examination showed her range of motion in her joints to be normal and no muscular tenderness. She reported to be limping. The assessment included fibromyalgia and rheumatoid arthritis. The examiner noted how Claimant needs to follow up with a psychiatrist to evaluate her depression. (Tr. 500). Her gait was antalgic and cane use was noted. (Tr. 501).

In follow-up treatment at St. Louis Connect Care on April 28, 2008, Claimant received a cortisone shot injected into her left knee. (Tr. 509).

On May 6, 2008, Dr. Zarmeena Ali evaluated Claimant for left knee pain, lower back pain, and slight headaches. (Tr. 502). She reported being out of Neurontin for the last weeks with relief and off of plaquenil since her last visit but she did not realize she was to continue taking the medication. (Tr. 502). She has good exercise habits and stretching lower back and hips as prescribed by physical therapist. (Tr. 503). Claimant reported "ortho exercises for her knees including the tread mill and stair master and exercising regularly" and "has been disabled for last two years." She is seeing a psychotherapist and has insomnia due to pain. (Tr. 503). Examination of her lumbar spine revealed muscle spasms and muscle tenderness. (Tr. 504). Dr. Ali observed limping in her gait and using a cane and her mood to be anxious and included in his assessment "rheumatoid arthritis RF positive neg CCP no synovitis"and fibromyalgia. (Tr. 504).

In follow-up treatment on July 29, 2008, she reported having pain at the level of six out of ten, but she has no other verbal complaints. (Tr. 757, 814). She reported being out of gabapentin. (Tr. 757, 814). Dr. Ali observed her gait and stance and balance to be normal. (Tr. 758). His assessment included vitamin D deficiency, obesity, and osteoarthritis. (Tr. 759). Dr. Ali prescribed Cymbalta for depression and provided a refill of gabapentin. (Tr. 759, 815).

On July 19, 2008, Dr. Grossberg at Jewish Children Family Center completed an adult psychiatric evaluation, and she reported being frustrated since she stopped working three years earlier. (Tr. 692). After her fiancé left two years earlier to work in Arkansas, her daughter became pregnant and dropped out of college. She has no previous psychiatric diagnosis, although she attempted suicide at age eighteen when she found out she was pregnant. (Tr. 692). She admitted to using marijuana a couple times a month to help with her pain. (Tr. 693). She lives with her daughter, son, and grandson. (Tr. 693). Dr. Grossberg diagnosed her with depression

and prescribed Cymbalta and noted she has financial stressors. (Tr. 695). On August 1, 2008, she returned for follow up. (Tr. 691). She reported not being able to fill her prescription through the county pharmacy, has not been feeling good, and rates her pain as 7/10. She has trouble with her daughter due to financial stresses. Dr. Grossberg prescribed Celexa. (Tr. 691).

In the Physical Residual Functional Capacity Assessment completed on August 20, 2008, Dr. Judith McGee listed knee osteoarthritis as her primary diagnosis and history of ankle and shoulder, DJD, obese, and rheumatoid arthritis as other alleged impairments. (Tr. 697). Dr. McGee found she can occasionally lift ten pounds, stand and/or walk for at least two hours in an eight-hour workday, sit for about six hours in an eight-hour workday, stand for at least two hours in an eight-hour workday, and unlimited in her ability to push/pull. (Tr. 699). In support, Dr. McGee noted how the treatment notes show Claimant has been getting cortisone shots with good improvement and range of motion. (Tr. 699). With respect to postural limitations, Dr. McGee found Claimant cannot climb ladders, ropes or scaffolds, and can occasionally climb stairs, balance, stoop, and kneel. (Tr. 700). She has not manipulative or visual limitations. (Tr. 700). Dr. McGee noted Claimant should avoid concentrated exposure to extreme cold or heat, vibration, and hazards. (Tr. 701).

In the Psychiatric Review Technique, Dr. McGee found Claimant to be moderately limited in her ability to understand and remember detailed instructions and her ability to carry out detailed instructions. (Tr. 703). Dr. McGee also found her to be moderately limited in her ability to accept instructions and respond appropriately to criticism. (Tr. 704). Dr. McGee opined Claimant must avoid all work involving intense or extensive interpersonal interactions such as handling customer complaints and public contact. (Tr. 705). She found Claimant can understand,

remember, carry out, and persist at simple tasks, make simple work-related judgments, relate adequately to coworkers or supervisors, and adust adequately to ordinary changes in work routine or setting. (Tr. 705). In the Psychiatric Review Technique, Dr. McGee Claimant to have affective disorders and moderate limitation in her ability in maintaining concentration, persistence, or pace and mildly limited in her activities of daily living and maintaining social functioning. (Tr. 714).

During treatment on August 29 2008, Claimant reported being upset "because she was turned down for disability again." (Tr. 732). She reported just started taking Celexa one week earlier because she was afraid of the black box warning. Her pain has improved, and she has no current substance abuse. Dr. Saleh noted how she is non complaint. (Tr. 731). In follow-up treatment on September 26, 2008, she returned tearful after having seen a previous abuser, her stepfather, the day before. (Tr. 731). Dr. Saleh increased her Celexa dosage. (Tr. 731). She reported having pain and financial and social stressors that are keeping her down. Dr. Saleh found Claimant to be stable and still having some depression and continued her Celexa regimen. (Tr. 730).

On September 18, 2008, Claimant presented for annual examination and possible UTI. (Tr. 793).

On September 30, 2008, Claimant presented at John Murphy Health Center complaining of blurred vision and having rheumatoid like condition but she is not taking any specific medication for this condition. (Tr. 790).

On October 3, 2008, Dr. Ali treated Claimant for right and left knee pain, and noted she has no other verbal complaints. (Tr. 752, 811). Neurological examination showed her mood not

to be anxious. (Tr. 754). Dr. Ali assessed her with morbid obesity and fibromyalgia. Dr. Ali opined her symptoms might be related to rheumatoid arthritis but she had no synovitis on examination. (Tr. 754).

In the Mental Residual Functional Capacity Questionnaire completed on October 17, 2008, Dr. Saleh noted he has treated Claimant monthly since July 2008. (Tr. 718). Dr. Saleh noted how she had been treated with antidepressant medications with minimal response. In the Clinical Findings, Dr. Saleh opined how she has a depressed mood with minimal response to medication. (Tr. 718). Dr. Saleh found Claimant would be unable to meet competitive standards in working in coordination with or proximity to others and completing a normal workday and work week without interruptions for psychologically based symptoms. (Tr. 720). Dr. Saleh further found she would be seriously limited in understanding and remembering very short and simple instructions, maintaining regular attendance, sustaining an ordinary routine, making simple work-related decisions, and performing at a consistent pace without an unreasonable number of rest periods. (Tr. 720). Dr. Saleh noted how she is exhibiting poor concentration, energy, and depressed mood, and she has not responded to medications. (Tr. 720). Dr. Saleh further found Claimant would be unable to meet competitive standards in understanding and remembering detailed instructions, carrying out detailed instructions, and setting realistic goals. (Tr. 721).

The November 5, 2008 radiology results of both knees showed minimal degenerative joint disease. (Tr. 749, 810).

On December 3, 2008 in follow-up treatment for knee pain, she reported not responding to cortisone injections. (Tr. 745).

On December 9, 2008, Claimant presented at North Central Community Center

complaining of eye discharge. (Tr. 784). The doctor noted Claimant to be alert and oriented x4 and having normal posture. (Tr. 784).

On December 12, 2008, Claimant reported doing well and having run out of her medication more than one week ago and starting to get depressed. (Tr. 729). Prior to running out of her medication, she was less irritable, having less depression, feeling less anxious, and having fewer outbursts. Claimant has fair energy and concentration. (Tr. 729).

In follow-up treatment for possible DJD at Connect Care on December 12, Claimant reported pain in her hip and knees to Dr. Ali. (Tr. 741). She experiences increased sedation with pain relief on Gabapentin and due to get a MRI on both knees for suspicion if meniscal tear. (Tr. 742). Her habits include good ortho exercises for her knees including tread mill and stair master and exercising regularly. (Tr. 743). Dr. Ali observed limping on her gait. (Tr. 743). Dr. Ali encouraged her to continue weight reduction and gave a trial of Lyrica and assistance in filling out forms for drug company inasmuch as she has had great response in the past. (Tr. 744).

The January 19, 2009 MRI of her left knee showed multiple medial femoral condyle cartilaginous defects with an osteochondral lesion and myxoid degeneration of the medial meniscus without discrete meniscal tear. (Tr. 767).

In the January 20, 2009 Endoscopy Risk Assessment, Claimant reported not taking narcotic pain medications for greater than six weeks. (Tr. 762).

In follow-up treatment on January 30, 2009, she reported being sad about her grandchild's father being killed, her mood being fair, poor energy level, and lack of motivation. (Tr. 728, 929). She has experienced improvement with her pain since starting Lyrica. Dr. Saleh found that she has some residual depression and added Wellbutrin to her medication regimen. (Tr. 728, 929).

The February 19, 2009 MRI of her left knee showed multiple femoral condyle cartilaginous defects with an osteochondral lesion and myxoid degeneration of the medial meniscus without discrete meniscal tear. (Tr. 806).

On March 13, 2009, she reported finding out her fiancé has been cheating on her, starting to become depressed, and has not been taking her medications. (Tr. 928). Dr. Saleh restarted Celexa and recommended continuing counseling. (Tr. 928).

On March 18, 2009, Claimant received an updated referral by Dr. Lautenschlager for a cortisone injection in her left knee. (Tr. 919). Claimant missed her scheduled appointment in the orthopedic clinic on April 15, 2009. (Tr. 922).

Dr. Ali treated Claimant on May 12, 2009, and she indicated no PAI as of today, and she had no other verbal complaints or concerns. (Tr. 861, 907). Dr. Ali last treated her for obesity, OA, and fibromyalgia. Claimant has had some improvement in muscle pain taking Lyrica and this has helped her symptoms of muscle pain but she still has continued pain, joint stiffness and numbness in her hands. Dr. Kiefer advised against knee surgery due to her age. (Tr. 861, 907). Dr. Ali observed her gait and stance to be normal. (Tr. 909). The immunology studies revealed nonspecific abnormal findings. (Tr. 909).

During treatment on May 15, 2009, she reported having poor energy and feelings of hopelessness and fair concentration. (Tr. 927). She has an occasional use of cannabis and having stopped taking her medication because she is concerned about weight gain. Dr. Saleh restarted her Celexa and encouraged her to reinitiate psychotherapy. (Tr. 927).

On June 26, 2009, Dr. Saleh noted how her mood had somewhat improved with antidepressants and therapy but she has been only partially compliant. (Tr. 926). Dr. Saleh noted

how Claimant stopped attending therapy and having fidelity issues with her fiancé.  Dr. Saleh found she has financial stress and relationship stress and assessed her GAF to be a 65.  He encouraged medication compliance and to restart therapy.  (Tr. 926).

In the Mental Status examination on July 10, 2009, Dr. Saleh found Claimant to be alert and oriented x3, and her mood to be fine.  (Tr. 925).  Dr. Saleh restarted Claimant on Celexa.  (Tr. 925).

On July 14, 2009, Claimant returned for treatment of obesity, fibromyalgia, and joint pain but not having any pain on that day.  (Tr. 876).  Her habits include ortho exercises for her knees including treadmill and stair master and exercising regularly.  (Tr. 877).  Dr. Ali observed her gait and stance to be normal.  (Tr. 878).  She was encouraged to continue exercise and weight reduction.  (Tr. 878).

In the August 24, 2009 treatment note, Dr. Ali noted the TC bone scan showed arthritic changes in left medial knee and right ankle.  (Tr. 875).

On August 27, 2009, Claimant reported feeling betrayed by her boyfriend who might be having a child with a woman in Arkansas.  (Tr. 924).  Her fibromyalgia symptoms were worse.  (Tr. 924).  In follow-up treatment on October 16, Claimant just returned from visiting her fiancé in Arkansas, and he is having a baby in February with another partner.  (Tr. 923).  She plans to move to Arkansas and has applied for disability.  Dr. Saleh noted she has good insight and judgment.  (Tr. 923).

During follow-up fibromyalgia treatment on November 3, 2009, she reported how Lyrca helps her symptoms of pain.  (Tr. 1017).  Examination of her spine revealed no muscle spasms, and Dr. Ali noted the straight-leg raising test to be negative.  (Tr. 1019).  Dr. Ali observed her

gait to be normal. Examination showed multiple tender point but no synovitis. (Tr. 1019). Dr. Ali noted how she does not have any synovitis or symptoms of joint swelling or stiffness. (Tr. 1020).

Claimant missed her appointments scheduled on December 18, 2009 and February 26, 2010 at Connect Care. (TR. 1031-33).

In the Physical Residual Functional Capacity Questionnaire completed on January 14, 2010, Dr. Ali noted how he first treated Claimant in 2007, and he last treated her in November 2009. (Tr. 930). She has been diagnosed with vitamin deficiency, fibromyalgia, and a rheumatoid factor. Dr. Ali identified as his clinical findings her reduced motor strength of all limbs due to pain, depressed affect, and multiple tender points. (Tr. 930). Dr. Ali found her impairments would occasionally interfere with attention and concentration to perform simple work tasks. (Tr. 931). Dr. Ali noted she can walk a half a block without rest, sit for two hours, and stand for one hour. (Tr. 931). Dr. Ali opined how she would need a job permitting her to shift positions at will and to take unscheduled breaks during the workday. (Tr. 932). Dr. Ali noted how she does not use a cane or other assistive device, and she does not have significant limitations with reaching, handling, or fingering. (Tr. 932-33). She would have to miss four days each month. (Tr. 933).

On February 11, 2010, Dr. Alan Morris completed an orthopedic evaluation after reviewing the records from St. Louis Connect Care. (Tr. 935). Her chief complaints included both knees, right ankle and foot issues. She reported using a cane 100% of the time since October 2009 and the use of the cane to be self-prescribed. (Tr. 935). Dr. Morris diagnosed Claimant with bilateral knee arthralgia with osteo-chondrule defect, medial femoral condyle left knee, and a prior left ankle surgery with right foot pain. (Tr. 937). During the examination, Dr.

Morris observed how she constantly rubs her knees and periodically states how "the pain grabs me." (Tr. 935). Dr. Morris observed she cannot heel walk or do a tandem gait, and she uses a cane at all times. (Tr. 936-37).

In the Medical Source Statement of Ability to Do Work-Related Activities (Physical), Dr. Morris found that she can occasionally lift up to ten pounds and never carry ten pounds; sit for fifteen minutes; stand and walk for ten minutes at one time without interruption; sit for two hours in an eight-hour workday, stand for thirty minutes in an eight-hour workday, and walk for fifteen minutes in an eight-hour workday. (Tr. 939-40). He indicated she lies in bed as the activity she performs for remainder of the eight-hour time period. (Tr. 940). Dr. Morris found she cannot ambulate without a cane, and the use of the cane is medically necessary. (Tr. 940). Dr. Morris restricted her use of hands for reaching and pushing and pulling. (Tr. 941). Dr. Morris found she could never operate foot controls with her right foot. (Tr. 941). Dr. Morris further found she can never perform activities like shopping, and never ambulate without using a wheelchair, walker, or two canes. (Tr. 944).

On February 11, 2010, Dr. Dianna Moses-Nunley completed a psychological evaluation on referral by Disability Determinations. (Tr. 948). Dr. Moses-Nunley noted how she grimaced often in pain even when not moving and observed her gait to be very slow. (Tr. 948). Although she completed the MMPI-2, the validity of the scores were considered invalid because she is either magnifying her problems in order to appear worse off, or she has a great deal of pathology in her current personality functioning and emotional state. (Tr. 951). Dr. Moses-Nunley noted how testing and background information are suggestive of use of physical problems for secondary gain. (Tr. 952). Her diagnosis included major depressive disorder, single episode, moderate and

occupational and economic problems and assigned a GAF score of 58. Dr. Moses-Nunley found her intellectual functioning is in the low average range and this might contribute to mild impairments in tasks of daily functioning but she should not have significant disability related to her cognitive functioning. (Tr. 952).

In the Medical Source Statement of Ability to Do Work-Related Activities (Mental), Dr. Moses-Nunley found her to be mildly limited in her ability to interact with the public and coworkers, and respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 957).

During treatment on July 14, 2010, Claimant reported not taking Lyrica for weeks, and she usually walks with a cane but she was not using one on that day. (Tr. 977).

In psychotherapy treatment on February 25, 2011, Claimant reported her depression is better overall. (Tr. 1002). On April 1, she reported improvement of her mood with the increase in dose of Celexa. (Tr. 1000). She is dissatisfied with her social-financial situation with the need to depend on others and her son's mental health issues and his frequent problematic behaviors with legal consequences. She feels her relationship has improved, and she is able to handle the stress. She is following up regularly with her rheumatologist and finds pregablin works well for her pain.(Tr. 1000). On July 15, she noted her son's social situation and mental health continue to cause her stress. (Tr.998). In follow-up on October 28, if she could get money and take care of her finances, she would be happy. (Tr. 997). On December 23, she noted how she is dealing with a lot of issues of her own as well as her son (fiances cheated on them). (Tr. 1015).

## IV.    The ALJ's Decision

The ALJ found that Claimant meets the insured status requirements of the Social Security

Act through March 31, 2010.  (Tr. 13).  Claimant has not engaged in substantial gainful activity since January 1, 2006, the alleged onset date of disability.  (Tr. 13).  The ALJ found that the medical evidence establishes that Claimant has the severe impairments of osteoarthritis of the knees, a history of ankle fracture, obesity, fibromyalgia syndrome, marijuana abuse, borderline intellectual functioning, depression, and personality disorder, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 13-16).  The ALJ found Claimant has the residual functional capacity to perform light work except she can lift and/or carry 20 pounds occasionally; she can lift and/or carry 10 pounds frequently; she can stand and/or walk for six hours in an 8-hour day; she has no limits on sitting; she can occasionally climb stairs and ramps; she can never climb ropes, ladders, or scaffolds; she can balance frequently; she can stoop, kneel, crouch, or crawl occasionally; she should avoid concentrated exposure to extreme cold, wetness, heat, sun, humidity, and hazards of heights; she can understand, remember, and carry out at least simple instructions, non-detailed tasks; she can demonstrate adequate judgment to make simple work-related decisions; she can adapt to routine simple work changes; and she can perform repetitive work according to set procedures, sequence, and pace.  (Tr. 19).  The ALJ found that Claimant is able to perform her past relevant work as a cashier as well as the job such as an usher.  (Tr. 26).  The ALJ found that Claimant was not under a disability from January 1, 2006 through the date of this decision.  (Tr. 27).

## V.    Discussion

In a  disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ

proceeds to step five in which the ALJ determines whether the claimant is capable of performing

other work in the national economy. In step five, the ALJ must consider the claimant's "age,

education, and past work experience." Only if a claimant is

found incapable of performing other work in the national economy will she be found disabled. 20

C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be

affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274

F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a decision." Id. The court's review

"is more than an examination of the record for the existence of substantial evidence in support of

the Commissioner's decision, we also take into account whatever in the record fairly detracts

from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will

affirm the Commissioner's decision as long as there is substantial evidence in the record to

support his findings, regardless of whether substantial evidence exists to support a different

conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative

record and consider:

1.      The credibility findings made by the ALJ.

2.      The claimant's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The claimant's subjective complaints relating to
        exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the
        claimant's impairments.

6.      The testimony of vocational experts when required which
        is based upon a proper hypothetical question which sets forth the claimant's
impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

        The ALJ's decision whether a person is disabled under the standards set forth above is

conclusive upon this Court "if it is supported by substantial evidence on the record as a whole."

Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935

(8th Cir. 2008). "Substantial evidence is less than a preponderance but is enough that a

reasonable mind would find it adequate to support the conclusion." Wiese, 552 F.3d at 730

(quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the

record to determine whether the Commissioner's decision is supported by substantial evidence,

however, the Court must consider evidence that supports the decision and evidence that fairly

detracts from that decision. Id. The Court may not reverse that decision merely because

substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d

1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at

730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those

positions represents the agency's findings, the [Court] must affirm the agency's decision."

Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792,

798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's

decision falls within the available zone of choice") (internal quotations omitted).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ failed to point to some medical evidence in formulating the RFC. Next, Claimant contends that the hypothetical question to vocational expert did not capture the concrete consequences of her impairments.

A.    Residual Functional Capacity and Credibility Determination

A claimant's RFC is what he can do despite his limitations. Dunahoo 241 F.3d at 1039. The claimant has the burden to establish his RFC. Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). The ALJ determines a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Eichelberger, 390 F.3d at 591; 20 C.F.R. § 404.1545(a). The ALJ is "required to consider at least some supporting evidence from a [medical professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace. Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (internal quotation marks and citation omitted). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Id.

The ALJ found that Claimant has the residual functional capacity to perform light work except she can lift and/or carry 20 pounds occasionally; she can lift and/or carry 10 pounds frequently; she can stand and/or walk for six hours in an 8-hour day; she has no limits on sitting; she can occasionally climb stairs and ramps; she can never climb ropes, ladders, or scaffolds; she can balance frequently; she can stoop, kneel, crouch, or crawl occasionally; she should avoid concentrated exposure to extreme cold, wetness, heat, sun, humidity, and hazards of heights; she

can understand, remember, and carry out at least simple instructions, non-detailed tasks; she can demonstrate adequate judgment to make simple work-related decisions; she can adapt to routine simple work changes; and she can perform repetitive work according to set procedures, sequence, and pace.

The undersigned will begin with a review of the ALJ's credibility determination. See Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005) (it is clearly established that, before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility).

The Eighth Circuit has recognized that, due to the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Polaski, 739 F.2d 1321-22. In Polaski, the Eighth Circuit addressed this difficulty and set forth the following standard:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions.

Id. at 1322.

A claimant's complaints of pain or symptoms "shall not alone be conclusive evidence of disability ... there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques." Travis v. Astrue, 477 F.3d 1037, 1042 (8th Cir. 2007) (citing 42 U.S.C. § 423(d)(5)(A). An ALJ may not disregard subjective complaints merely because there is no evidence to support them, but may disbelieve such allegations due to "inherent

inconsistencies or other circumstances." Id. (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)); see also Polaski, 739 F.2d at 1322 (although the ALJ may not accept or reject the claimant's subjective complaints based solely upon personal observations, he may discount such complaints if there are inconsistencies in the evidence as a whole). The "crucial question" is not whether the claimant experiences symptoms, but whether his credible subjective complaints prevent him from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). The credibility of a claimant's subjective testimony is primarily for the ALJ, not this Court, to decide, and this Court considers with deference the ALJ's decision on the subject. Tellez, 403 F.3d at 957. When an ALJ considers the Polaski factors and discredits a claimant's subjective complaints for a good reason, that decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001).

In his decision the ALJ thoroughly discussed the medical evidence of record, how her impairments improved or were controlled by treatment, her noncompliance with medical treatment, her failure to follow medical advice, possible exaggeration of symptoms, uneven work history and poor earnings record, and her daily activities. See Gray v. Apfel, 192 F.3d 799, 803-04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities). The lack of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995) (lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994) (the ALJ was entitled to find that the absence of an objective

medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). The ALJ noted that although Claimant asserts that she is unable to work due to fibromyalgia, knee and hand problems, multiple screws in her right ankle, migraine headaches, depression, stress, loss of hand function, and limited ability to sit, stand, walk, and lift her arms overhead, the clinical and objective medical findings are inconsistent with an individual experiencing totally debilitating symptomatology. In support, the ALJ cited to the treatment notes of record and the improvement on medication. The ALJ then addressed other inconsistencies in the record to support his conclusion that Claimant's complaints were not credible.

The ALJ properly considered the inconsistencies between Claimant's allegations and her daily activities. The ALJ noted that Claimant has been found to have only mild restrictions in her activities of daily living and able to care for her son who has mental health issues and frequent problematic behaviors with legal consequences. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001) ("[i]nconsistencies between subjective complaints of pain and daily living patterns diminish credibility"); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996) (affirming ALJ's discount of claimant's subjective complaints of pain where claimant was able to care for one of his children on daily basis, drive car infrequently, and go grocery shopping occasionally).

The ALJ further noted how the various forms of treatment including prescription medications for her alleged disabling symptoms have been generally successful in controlling those symptoms. The ALJ considered how the medical records showed her impairments were controlled with prescribed medication. Conditions which can be controlled by treatment are not disabling. See Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009); Schultz v. Astrue, 479

F.3d 979, 983 (8th Cir. 2007) (holding that if an impairment can be controlled by treatment, it cannot be considered disabling); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that medical condition that can be controlled by treatment is not disabling). The medical record establishes shows how Claimant reported Lyrca helping her symptoms and improvement on the increased dosage of Celexa. On July 20, 2007, Claimant reported marked improvement in joint swelling after starting a trail of prednisone. In the May 6, 2008 progress note, Claimant reported having pain all over her body and Neurontin helping with the pain, but she had been out of Neurontin for two weeks. On December 12, 2008, Claimant reported doing well and prior to running out of her medication, she was less irritable, having less depression, feeling less anxious, and having fewer outbursts. During follow-up fibromyalgia treatment on November 3, 2009, she reported how Lyrca helps her symptoms of pain. In psychotherapy treatment on February 25 and April 1, 2011, Claimant reported her depression is better overall and improvement of her mood with the increase in dose of Celexa.

In support of his credibility findings, the ALJ noted that Claimant's noncompliance with treatment greatly detracted from her credibility. The ALJ also noted the primary aggravating factor on the record is Claimant's failure to take medication. A lack of desire to improve one's ailments by failing to follow suggested medical advice detracts from a claimant's credibility. See Dunahoo, 241 F.3d at 1037 (claimant's failure to follow prescribed course of treatment weighed against credibility when assessing subjective complaints of pain); Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) (holding impairments which are controllable or amenable to treatment do not support a finding of disability, and failure to follow a prescribed course of remedial treatment, including cessation of smoking, without good reason is grounds for denying an

application for benefits); <u>Johnson v. Bowen</u>, 866 F.2d 274, 275 (8th Cir. 1989) (holding that an ALJ can discredit subjective complaints of pain based on claimant's failure to follow a prescribed course of treatment).  On July 29 and October 11, 2007, May 6, July 29, August 28, and December 12, 2008, and March 13 and May 15, 2009, and July 14, 2010, Claimant reported being out of medications or not taking her medications.  Likewise, on August 28, 2008 and June 26, 2009, Dr. Saleh noted how she is non complaint or partially complaint.  Claimant missed scheduled appointments on April 5 and December 28, 2009 and February 26, 2010.  <u>See</u> <u>Eichelberger</u>, 390 F.3d at 589 (holding that the ALJ properly considered that the plaintiff canceled several physical therapy appointments and that no physician imposed any work-related restrictions on her).  The medical records show Claimant was routinely noncompliant with her medical treatment, and when noncompliant with her medication regimen, she deteriorated and her symptoms intensified.  <u>See</u> <u>Davidson v. Astrue</u>, 578 F.3d 838, 846 (8th Cir. 2009) ("Impairments that are controllable or amenable to treatment do not support a finding of disability.");  <u>Schultz v.</u> <u>Astrue</u>, 479 F.3d 979, 983 (8th Cir. 2007) (noting that if impairment can be controlled by treatment, it cannot be considered disabling).  The lack of regular mental health treatment further detracts from her credibility.  The record shows that Claimant did not seek regular mental health treatment until July 2008.

As noted by the ALJ, Claimant's increased symptoms coincided with times of high stress.  Indeed, the treatment notes show that Claimant's conditions improved with treatment with situational stressors such as fiancé  problems, son's problems, and financial issues causing increased symptoms.  Likewise, on April 3, 2008, Claimant questioned whether her fatigue was strongly related to situational stress, and Dr. Lautenschlager referred Claimant for evaluation of

situational stress problems. Situational depression, however, is not disabling. See Gates v. Astrue, 627 F.3d 1080, 1082 (8th Cir. 2010) (ALJ properly found depression not disabling where is "was situational in nature, related to marital issues, and improved with a regimen of medication and counseling"); Dunahoo, 241 F.3d at 1039-40 (holding that depression was situational and not disabling because it was due to denial of food stamps and workers compensation and because there was no evidence that it resulted in significant functional limitations). In July 2008, Claimant reported frustration and irritability after losing her job three years earlier and her fiancé moving out of state to work in Arkansas, and her daughter becoming pregnant and dropping out of college. She was diagnosed with depression and prescribed Cymbalta, and the doctor noted she has financial stressors. In follow-up treatment, Claimant reported being upset after being turned down for disability again and how financial and social stressors are keeping her down. In follow-up treatment on January 30, 2009, she reported being sad about her grandchild's father being killed and on March 13, 2009, she reported finding out her fiancé has been cheating on her and starting to become depressed, but not been taking her medications. On August 27, 2009, Claimant reported feeling betrayed by her boyfriend who might be having a child with a woman in Arkansas. During treatment in April and July, 2011, she reported her son's mental health issues, frequent problematic behaviors with legal consequences, and her social-financial situation were constant sources of stress. On December 23, 2011, Claimant noted how she is dealing with a lot of issues of her own as well as her son, both of their fiancés cheated on them. As such, the undersigned finds that the ALJ properly considered that situational issues added stress to her situation and that the ALJ's decision in this regard is supported by substantial evidence.

Further, the ALJ evaluated other inconsistencies in the record including Claimant's reports

regarding possible symptom magnification. Examining physicians also noted signs of symptom magnification. See Baker v. Barnhart, 457 F.3d 882, 892 (8th Cir. 2006) (ALJ may draw conclusions from claimant's exaggeration of symptoms in evaluating subjective complaints). During a consultative evaluation, Dr. Moses-Nunley observed how Claimant grimaced often in pain even when not moving and observed her gait to be very slow. Although she completed the MMPI-2, the validity of the scores were considered invalid by Dr. Moses-Nunley because she is either magnifying her problems in order to appear worse off, or she has a great deal of pathology in her current personality functioning and emotional state. Likewise, Dr, Moses-Nunley noted how testing and background information are suggestive of use of physical problems for secondary gain. E,g,, Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006) (physicians' statements of symptom exaggeration, coupled with tests that were inconsistent with complaints of pain, supported ALJ's adverse credibility determination).

The undersigned notes contradictions between a claimant's sworn testimony regarding the need to use two canes and what she actually told physicians weighs against the claimant's credibility. Karlix v. Barnhart, 457 F.3d 742, 748 (8th Cir. 2006) (finding a lack of credibility when claimant's testimony regarding drinking consumption conflicted with medical documentation). Although she testified that Dr. Ali told her to use a cane to ambulate, Dr. Ali in the residual functional capacity questionnaire indicated that she did not need to use a cane and in treatment notes observed Claimant was not using a cane. See Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004) (whether there is a need to lie down is a medical question requiring medical evidence; record did not contain any evidence that medical condition required claimant to lie down for hours each day). Further, the record shows during an orthopedic evaluation by Dr.

Morris on February 11, 2010, she reported using a cane 100% of the time since October 2009 and the use of the cane to be self-prescribed. Thus, if Claimant was not using a cane out of medical necessity, she must be doing so out of choice. See Craig v. Chater, 943 F. Supp. 1184, 1188 (W.D. Mo. 1996); Cf. Harris, 356 F.3d at 930. As such, the undersigned finds that the ALJ's consideration of the discrepancies between Claimant's testimony and what doctors observed during treatment is supported by substantial evidence.

Finally, the ALJ cited Claimant's very sporadic work history of mostly low wages as additional factors detracting from her credibility regarding the severity of her impairments alleged and her overall motivation to work versus motivation for benefits inasmuch as her record documents poor and overall inconsistent earnings. The ALJ noted how

> [t]he claimant even had very low wages prior to her alleged disability onset date. The claimant's work record itself draws into question her motivation to work and her credibility as a witness herein. While not the sole factor for consideration, there are considerable discrepancies between the objective medical evidence and the claimant's allegations of an inability to do her work. The undersigned also notes that there is also a strong element of secondary gain to the claimant's claim because with her history of low earnings, she may possibly receive more in disability insurance benefits and supplemental security income than she has in the past from any employment.

(Tr. 22). A poor work history lessens a Claimant's credibility. See Fredrickson v. Barnhart, 359 F.3d 972, 976-77 (8th Cir. 2004)(holding that claimant was properly discredited due, in part, to her sporadic work record reflecting low earnings and multiple years with no reported earnings, pointing to potential lack of motivation to work);Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993); see also Ramirez v. Barnhart, 292 F.3d 576, 581-82 (8th Cir. 2002) (poor work record and financial motivation for benefits may contribute to adverse credibility determination when other factors cast doubt upon claimant's credibility); Pearsall v. Massanari, 274 F.3d 1211, 1218

(8th Cir. 2001) (a poor work history "may indicate a lack of motivation to work, rather than a lack of ability."); Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996) (low earnings and significant breaks in employment cast doubt on complaints of disabling symptoms). This is a proper consideration. See Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011); accord Wildman v. Astrue, 596 F.3d 959, 968-69 (8th Cir. 2010). The record reflects Claimant's highest earnings were $10,976.66 in 2001. (Tr. 331).

Moreover, the undersigned notes that no treating physician in any treatment notes stated that Claimant was disabled or unable to work or imposed significant long-term physical and/or mental limitations on Claimant's capacity for work. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints). The absence of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012); Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995)(lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints).

After engaging in a proper credibility analysis, the ALJ incorporated into Claimant's RFC those impairments and restrictions found to be credible. See McGeorge v. Barnhart, 321 F.3d

766, 769 (8th Cir. 2003) (the ALJ "properly limited his RFC determination to only the impairments and limitations he found credible based on his evaluation of the entire record."). The ALJ determined that the medical evidence supported a finding that Claimant could perform her past relevant work as a cashier. The vocational expert testified in response to hypothetical questions, that incorporated the same limitations as the RFC, and opined that such individual could also perform work as a usher.

As demonstrated above, a review of the ALJ's decision shows the ALJ not to have denied relief solely on the lack of objective medical evidence to support his finding that Claimant is not disabled. Instead, the ALJ considered all the evidence relating to Claimant's subjective complaints, including the various factors as required by Polaski, and determined Claimant's allegations not to be credible. Although the ALJ did not explicitly discuss each Polaski factor in making his credibility determination, a reading of the decision in its entirety shows the ALJ to have acknowledged and considered the factors before discounting Claimant's subjective complaints. See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). Inasmuch as the ALJ expressly considered Claimant's credibility and noted numerous inconsistencies in the record as a whole, and the ALJ's determination is supported by substantial evidence, such determination should not be disturbed by this Court. Id.; Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996). Because the ALJ gave multiple valid reasons for finding Claimant's subjective complaints not entirely credible, the undersigned defers to the ALJ's credibility findings. See Guilliams v. Barnhart, 393 F.3d 798, 801(8th Cir. 2005).

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before him and set out the inconsistencies detracting from Claimant's

credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ pointed out inconsistencies in the record that tended to militate against the Claimant's credibility. See Guilliams, 393 F.3d at 801 (deference to ALJ's credibility determination is warranted if it is supported by good reasons and substantial evidence). Those included the medical evidence of record, how her impairments improved or were controlled by treatment, her noncompliance with medical treatment, her failure to follow medical advice, possible exaggeration of symptoms, uneven work history and poor earnings record, and her daily activities. The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). Accordingly, the ALJ did not err in discrediting Claimant's subjective complaints of pain. See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001)(affirming the ALJ's decision that claimant's complaints of pain were not fully credible based on findings, inter alia, that claimant's treatment was not consistent with amount of pain described at hearing, that level of pain described by claimant varied among her medical records with different physicians, and that time between doctor's visits was not indicative of severe pain).

Claimant's contention that the ALJ improperly accorded little weight to the medical source statements of Dr. Saleh. The ALJ found Dr. Saleh's opinion appeared to be based on her subjective reports and was not well supported by the medical evidence. The undersigned agrees. Dr. Saleh noted how she had been treated with antidepressant medications with minimal response and opined how she has a depressed mood with minimal response to medication. Dr. Saleh also found Claimant would be unable to meet competitive standards of employment.

First, to the extent Dr. Saleh opined that Claimant is disabled and incapable of performing any competitive employment, a treating physician's opinion that a claimant is not able to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) (A physician's opinion that a claimant is "disabled" or "unable to work" does not carry "any special significance," because it invades the province of the Commissioner to make the ultimate determination of disability). The ALJ acknowledged that Dr. Saleh was a treating source, but that his opinions were not entitled to controlling weight because they are inconsistent with the objective medical evidence in the record. See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight."). The undersigned notes that Dr. Saleh's opinions are also inconsistent with his own treatment notes inasmuch as he never found such mental limitations during treatment. Likewise, Dr. Saleh's finding of minimal response to antidepressant medications is refuted by the medical record. Claimant consistently reported improvement and good response to antidepressant medications. The ALJ also noted although Dr. Saleh noted noncompliance with medications, his medical source statement fails to address the issue of noncompliance.

Finally, Claimant appears to argue ALJ erred in discrediting all of the medical opinion evidence in the record such that the record was devoid of any medical opinion evidence upon which the ALJ could base his RFC assessment. Claimant's argument is misplaced. As an initial matter, the undersigned notes that the ALJ did not entirely discredit this opinion evidence, as averred by Claimant, but considered such evidence and accorded the evidence some weight. A

review of the decision shows the ALJ afforded some weight to the opinion of Dr. Moses-Nunley and afforded some weight to the opinion of Dr. McGee and implicitly afforded weight to the opinions of Dr. Reid at the administrative hearing. The ALJ is "not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians" in determining a claimant's RFC. Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) (internal quotations marks and citation omitted) (alteration in Martise). Instead, the ALJ is required to consider the entirety of the record when determining a claimant's RFC, which is what the ALJ did here. Cf. Holmstrom v. Massanari, 270 F.3d 715, 720-21 (8th Cir. 2001) (ALJ did not err in discounting opinion evidence where other medical records show the effect of claimant's impairments).

A review of the ALJ's decision shows the ALJ to have conducted an exhaustive review of the medical evidence of record, including opinion evidence and observations of treating physicians and others. The ALJ evaluated all of the opinion evidence of record and provided good reasons for the weight accorded to each opinion. Substantial evidence on the record as whole supports the ALJ's determination as to the weight he accorded the opinion evidence in this cause.

In addition, upon conclusion of his discussion of specific medical records, nonmedical evidence, and the consistency of such evidence when viewed in the light of the record as a whole, the ALJ assessed her RFC and specifically set out Claimant's non-exertional limitations and work-related activity Claimant could perform based on the evidence available in the case record. Because the medical records provide some medical evidence to support the ALJ's RFC determination, the determination must stand. See Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008). Although not all of the medical evidence "pointed in that direction," there nevertheless

was a sufficient amount that did.  The ALJ's determination must therefore be upheld even if the record could also support an opposite decision.  See Moad v. Massanari, 260 F.3d 887, 891 (8th Cir. 2001).  See also Phillips v. Colvin, 721 F.3d 623, 629 (8th Cir. 2013) (it is the duty of the Commissioner to resolve conflicts in the medical evidence).

The substantial evidence on the record as a whole supports the ALJ's decision.  Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole.  Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

B.       Hypothetical Question

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the hypothetical question to vocational expert did not capture the concrete consequences of her impairments.

The ALJ may seek the opinion of a vocational expert regarding jobs the claimant can perform.  Pearsall, 274 F.3d at 1219.  The vocational expert will be asked to respond to a hypothetical question, posed by the ALJ, which includes all of the impairments of the claimant.  The question must "precisely set out the claimant's particular physical and mental impairments."

Leoux v. Schweiker, 732 F.2d 1385, 1388 (8th Cir. 1984). "'A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true.'" Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005) (quoting Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001)).  The ALJ's hypothetical question posed to a vocational expert need not include alleged impairments which the ALJ has rejected as untrue or unsubstantiated.  Hunt 250 F.3d at 625; Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000); Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997).

An error in posing the hypothetical question may be harmless, however, if there is no conflict with the vocational expert's testimony and the DOT or there is no indication that the ALJ would have decided the case differently.  See VanVickle v. Astrue, 539 F.3d 825, 830 (8th Cir. 2008) (ALJ harmless error where ALJ misread doctor's handwriting regarding whether claimant could "walk" or "work," because no indication that the ALJ's decision would have been different had he read the doctor's note correctly); Renfrow v. Astrue, 496 F.3d 918, 921 (8th Cir. 2007) (ALJ error in failing to ask vocational expert about possible conflicts between testimony and DOT harmless inasmuch as no conflict listed).

In addition, the undersigned notes that the ALJ based his hypothetical question on medical evidence contained in the record as a whole.  A proper hypothetical must include only those impairments accepted as true by the ALJ.  Pearsall, 274 F.3d at 1220.  Furthermore, an ALJ may omit alleged impairments from a hypothetical question posed to a vocational expert when "[t]here is no medical evidence that these conditions impose any restrictions on [the claimant's] functional capabilities."  Haynes v. Shalala, 26 F.3d 812, 815 (8th Cir. 1994).  Likewise, an ALJ may omit alleged impairments from a hypothetical question when the record does not support the claimant's

contention that his impairments "significantly restricted his ability to perform gainful employment." Eurom v. Chater, 56 F.3d 68 (8th Cir. 1995) (per curiam) (unpublished table decision). The ALJ did not include the alleged impairment and subjective complaints that he properly discredited. See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (ALJ may exclude alleged impairments he has properly rejected as untrue or unsubstantiated). Based on a proper hypothetical, the vocational expert testified that Claimant was able to perform jobs such as a cashier and an usher. The vocational expert's testimony provided substantial evidence to support the ALJ's determination that Claimant could perform light work. Therefore, substantial evidence supports the ALJ's determination that Claimant was not disabled. Id. As a result, the ALJ's hypothetical to the vocational expert was proper.

Claimant's contention that the vocational expert's testimony given in response to the hypothetical questions cannot constitute substantial evidence to support the ALJ's adverse decision is without merit. Claimant provides no additional argument nor identifies any other issue relating to the hypothetical questions posed to the vocational expert or the ALJ's reliance on testimony given in response thereto. Nor does Claimant present any argument or evidence demonstrating that she suffered restrictions more limiting than as determined by the ALJ and posed to the vocational expert in the hypothetical. Cf. Robson v. Astrue, 526 F.3d 389, 393 (8th Cir. 2008 (claimant did not identify what limitations were missing from hypothetical). An ALJ is not required to disprove every possible impairment. McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011).

For the reasons set out above, the ALJ did not err in his consideration of the relevant medical evidence and other evidence in this cause, including opinion evidence, in determining

Claimant's RFC.  Because the ALJ's RFC assessment was supported by substantial evidence, the hypothetical question based on the RFC was proper.  Accordingly, the vocational expert's testimony given in response to this hypothetical question constituted substantial evidence to support the ALJ's decision.  <u>Renstrom</u>, 680 F.3d at 1067-68; <u>Martise</u>, 641 F.3d at 927.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole.  Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently.  <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001).  Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

**IT IS HEREBY ORDERED** that the decision of the Commissioner be **AFFIRMED**.  A separate Judgment in accordance with this Memorandum and Order is entered this same date.


_____/s / Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE

Dated this ___6th___ day of February, 2015.